# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| **Walter Delaney Booker,** ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | 1:14cv833 (JCC/TCB) |
| ) | |
| **Sgt. S. Johnson,** ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Walter Delaney Booker, a Virginia inmate proceeding pro se, has filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that his Fourth, Fifth, and Sixth Amendment rights were violated by employees of the Portsmouth Police Department during two separate incidents on June 14, 2008 and September 9, 2008.[1] In addition, plaintiff alleges the state law claims of assault and battery, false imprisonment, invasion of privacy, intentional infliction of emotional distress, and negligence. Compl. By Order dated June 25, 2015, plaintiff's Fifth Amendment claims and his claims stemming from his September 9, 2008 arrest were dismissed with prejudice,[2] his complaint was filed, and the Clerk was directed to send Requests for Waiver of

---

[1] According to the Capias submitted as Dkt. No. 1, Ex. D, plaintiff was arrested, pursuant to a July 3, 2008, indictment, on September 9, 2008. In the Order dated June 25, 2016, Dkt. No. 13, the dates of plaintiff's arrest and indictment appear to have been transposed and the arrest date for plaintiff appears as September 3, 2008, rather than September 9, 2008.

[2] Although plaintiff's Sixth Amendment claims were not expressly dismissed in the June 25, 2008 Order, those claims stem from plaintiff's allegations that certain defendants failed to advise him of his right to counsel by reading him his Miranda rights. As discussed in this Court's June 25, 2015 Order, Dkt. No. 13, Miranda related claims may not be brought in a § 1983 action. Moreover, plaintiff does not allege that Sergeant Johnson, the only remaining defendant in this action, was involved in plaintiff's September 9, 2008 arrest. Therefore, for the purposes of this opinion plaintiff's Fifth and Sixth Amendment claims will be considered dismissed.

Service of Summons to the defendants.[3] Dkt. No. 13.

Sergeant Steven Johnson, the sole remaining defendant in this action, has filed a Motion for Summary Judgment with a supporting memorandum of law and exhibits, which is now pending, and has provided plaintiff with the notice required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K). Dkt. Nos. 39–41. Plaintiff has filed a "Response/Brief in opposition to Dkts. 39–40 Defendants Motion for Summary Judgment," and a motion for discovery, Dkt. Nos. 50, 51, to which Johnson has responded with a rebuttal brief and an opposition motion respectively.[4] Dkt. Nos. 53, 55. After consideration of these submissions, the Motion for Summary Judgment will be granted, judgment will be entered in favor of the defendant, and plaintiff's Motion for Discovery will be denied as moot.

## I. Background

Plaintiff alleges that between 1:30 a.m. and 2:30 a.m. on June 14, 2008 he received a phone call advising him that someone had been killed at a party at which he knew several guests. Compl. ¶ 10. Following the call, plaintiff was driven to the location of the party. Id. ¶ 13.

---

[3] On July 14, 2015, defendant Sgt. Steven Johnson returned an executed waiver of service to the Court, but the waivers for the other remaining defendants were returned, unexecuted, with the notation "unable to forward." Dkt. Nos. 18, 27. By Order dated May 25, 2016, the attorney general was requested to provide the last known forwarding addresses for the defendants whom had not been served, and plaintiff was advised that if service could not be effected those defendants would be dismissed without prejudice. Dkt. No. 27. Because service could not be effected on those defendants, they were dismissed without prejudice.

[4] Plaintiff has submitted a "Reply/Response to Defendant's Rebuttal Brief for Summary Judgment, with accompanying declaration in support, and a Reply to Defendant's Brief in Opposition of Motion for Discovery. Dkt. Nos. 56–57. Although courts have the discretion to allow a party to file a sur-reply, they are generally only permitted when fairness dictates that they do so based on new arguments raised in the previous reply. Khoury v. Meserve, 268 F. Supp. 2d 600, 605–06 (D. Md. 2003), aff'd, 85 F. App'x 960 (4th Cir. 2004). Where a party seeks to re-open briefing on issues previously raised, a sur-reply should not be allowed. Interphase Garment Solutions, LLC v. Fox Television Stations, Inc., 566 F. Supp. 2d 460, 467 (D. Md. 2008). Because plaintiff merely attempts to counter plaintiff's arguments concerning issues previously raised, without providing any new information, his additional pleadings, Dkt. Nos. 56–57, will not be considered.

According to plaintiff, there was no crime scene tape at the back of the residence. Dkt. No. 50 ¶ 2. Plaintiff encountered an unknown police officer at a back door and inquired about the condition of the individuals at the party, but he never touched the back door, attempted to enter the house, or attempted to walk around the officer. Compl. ¶¶ 16-17; Dkt. No. 50 at 8, ¶¶ 2, 20. When the officer requested that plaintiff identify himself, plaintiff stated he was "an acquaintance of individuals who were attending the party and the owner." Compl. ¶ 18. After the officer declined to answer plaintiff's questions, plaintiff stated "he would be on his way." Id. ¶ 19. The officer responded "no you come with me," and brought plaintiff to his supervising officer, Sergeant Johnson, out on the street. Id. ¶ 21. Plaintiff did not see that officer or any other officer radio information to Johnson prior to being accompanied out to the street. Dkt. No. 50. According to plaintiff, when Johnson saw plaintiff he stated "Oh that's Mr. Booker I know him, put him in a car." Id. ¶ 22. The unknown officer then grabbed plaintiff and placed him in the back of a police car. Id. ¶ 23. In plaintiff's view, Johnson's statement concerning plaintiff "would refute any [proffered] rational reason" for directing plaintiff to be placed in a car, id. ¶ 57, and the only reasonable inference that could "be drawn by plaintiff's actions was that he was concerned and was involved in innocent behavior." Dkt. No. 50.

After plaintiff had been seated in the car for approximately thirty minutes, the unknown officer returned and placed plaintiff in handcuffs. Id. ¶ 24. Approximately thirty minutes later, another handcuffed individual was placed in the car with plaintiff. Id. ¶ 25. Approximately forty minutes after that, an officer conducted a "primer test" on both individuals. Id. ¶ 26. Plaintiff contends that he did not consent to the primer test. Id. ¶ 26. Although the other individual in the car was released following the primer test, plaintiff was advised that he was not free to leave, and he was eventually transported to the police station. Id. ¶ 25. At the station plaintiff was

3

handcuffed to a wall for approximately one to two hours before an officer took him into an interrogation room at approximately 7:30 a.m. Id. ¶¶ 28-31. Plaintiff states that two officers interrogated him about the homicide without reading him Miranda rights and without informing him whether he had been charged with a crime. Id. ¶¶ 35-43. Plaintiff was released later that day. Id. ¶ 45.

Johnson contends that at approximately 2:40 a.m. on June 14, 2008, he responded to a call involving a gunshot wound. Dkt. No. 1, Ex. A. Part of Johnson's duties included supervising the separation and securing of witnesses, restricting access to the crime scene, and preserving physical evidence; thus, he "began directing officers to establish a crime scene by erecting crime scene tape." Dkt. No. 1, Ex. A; Dkt. No. 40 ¶¶ 7, 16. According to Johnson, officers on the scene secured the area outside the rear of the building by erecting crime scene tape "from the corners of the rear of the building to the edge of the fence, closing off ready access to that area." Dkt. No. 40 ¶ 18.

When medics advised Johnson that there was a deceased victim in the residence who needed to be identified, he stated that he would try to make the identification. Dkt. No. 1, Ex. A. Johnson entered the residence, and he immediately recognized the deceased as Montale Smith, someone whom he had known to be "involved in the sale of narcotics" and whom he "had dealings with for many years." Dkt. No. 1, Ex. A; Dkt. No. 40, Ex. 1 ¶ 10. While inside the residence, Johnson noticed a rear door and he requested that some officers "respond to [the] rear of the location to secure it." Dkt. No. 1, Ex. A. As he was attempting to separate as many witnesses as possible into police vehicles, Johnson was advised "that a subject was attempting to enter the backdoor of the residence." Dkt. No. 1, Ex. A. More specifically, Johnson states that he "received a communication from a police officer located at the back of the residence that a

person had come over the rear fence and hedge, and that person was attempting to enter the back door of the residence." Dkt. No. 40 ¶ 20; id., Ex. 1 ¶ 14. Plaintiff does not expressly contest that such information was communicated to Johnson. Rather, he contends that he did not commit the acts alleged and that any such allegations were not communicated to Johnson in his presence.[5] Dkt. No. 51. Following the communication, Johnson advised the officers to detain the subject and put him in a police vehicle until detectives arrived. Dkt. No. 1, Ex. A; Dkt. No. 40, Ex. 3 ¶ 16.

Based on his twenty-one years of experience, Johnson believed it was "highly unusual and suspicious" for an individual to attempt to enter an active crime scene from the rear door, and such actions caused him to believe that plaintiff may have been involved in the shooting. Dkt. No. 40 ¶ 24; id., Ex. 1 ¶ 16. Upon seeing plaintiff in the police car, Johnson recognized him as someone whom Johnson had known to be involved in "narcotics related activities." Dkt. No. 40 ¶ 23; id., Ex. 1 ¶ 15. Notably, plaintiff had three prior convictions for possession with intent to distribute in Portsmouth, Virginia—on 12/1/1997, 1/10/2003, and 4/18/2007. Id., Ex. 3. Johnson believed that "he was acting lawfully in detaining [plaintiff] to allow investigators to interview him based on his attempted entry into the crime scene, the potential that his entry into the crime scene was to obstruct justice, and to allow detectives to assess . . . what involvement he may have had in the shooting." Dkt. No. 40, Ex. 1 ¶ 17.

When the homicide detective in charge of the investigation arrived on the scene at approximately 3:50 a.m., Johnson turned the investigation over to him. Dkt. No. 40, Ex. 1 ¶ 18; Id. Ex. 2 ¶ 8. A short time later, the detective advised Johnson that consent to search the

---

[5] Additionally, in a portion of his brief in opposition to defendant's summary judgment motion titled "Disputed Facts," plaintiff poses the following rhetorical question: "Whether an unknown officer radioed Sergeant Johnson and communicated that plaintiff jumped a fence and hedge to enter the crime scene?" Dkt. No. 50 at 3.

5

residence had been obtained from the leaseholder, who stated that plaintiff resided there. Dkt. No. 40, Ex. 3 ¶ 19; Dkt. No. 51 M. Luck Investigative Narrative. Johnson remained at the scene and participated in the search of an area of the residence where the following items were found: $5,000.00 in cash, papers belonging to plaintiff, caplets containing a substance believed to be heroin, a firearm, and drug paraphernalia—which included empty caplets, a single-edged razor, screen strainers, rubber gloves, and a coffee grinder. Dkt. No. 40 ¶¶ 34, 39; id., Ex. 1 ¶ 19. As he recalls, the search occurred around 4:15 a.m. Id., Ex. 1 ¶ 19. Johnson did not touch or attempt to touch plaintiff at any time. Dkt. No. 40 ¶ 44; id., Ex. 1 ¶ 21.

On September 9, 2008, plaintiff was arrested on a July 2008 indictment charging him with possession with intent to distribute heroin, possession of a firearm during the comission of a felony, and possession of a firearm by a known felon. Compl. ¶ 46; id., Ex. D. These charges arose out of evidence collected on June 14, 2008, as part of the homicide investigation by the Portsmouth Police Department. Following his September 9, 2008 arrest, plaintiff was again questioned about the homicide without being read his Miranda rights "and was instructed to allow [an officer] to swab his mouth to make sure he was not connected to the homicide." Compl. ¶¶ 47, 50. Plaintiff was never charged in relation to the homicide, and he eventually pleaded guilty to possession with intent to distribute heroin. See Booker v. Commonwealth, 61 Va. App. 323, 327, 734 S.E.2d 729, 731 (2012).

Plaintiff contends that, as a result of his interactions with the police on June 14, 2008, and September 9, 2008, he has suffered from a "loss of trust in [police] officers to protect him instead of fabricating evidence, [and] involving him in crimes unjustified by any facts." Compl. ¶ 88. He further alleges that he fears he can "never go to any police or public officer for help because

he could be subjected to blame, humiliation, [or] fabrication [of] any type of involvement in any action." Id. ¶ 92.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party, thus, bears the burden of proving that judgment on the pleadings is appropriate, i.e., that no genuine issues of material fact are present for resolution. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The facts which a moving party bears the burden of proving are those which are material, and materiality is dictated by "the substantive law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once a moving party has met its burden of proof, the non-moving party must produce specific facts to generate a disputed issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court will view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Porter v. U.S. Alumoweld Co., 125 F.3d 243, 245 (4th Cir. 1997). Nevertheless, "[o]nly disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Unsubstantiated, conclusory claims without evidentiary support are insufficient to defeat a summary judgment motion. Braithwaite v. Hinkle, 752 F. Supp. 2d 692, 694 (E.D. Va. 2010), aff'd, 412 F. App'x 583 (4th Cir. 2011). Therefore, evidence that is "merely colorable, or is not significantly probative," will not preclude summary judgment. Anderson, 477 U.S. at 249–50 (internal citations omitted). Summary judgment is appropriate

7

only when no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. Matsushita, 475 U.S. at 587

### III. Analysis

#### A. Fourth Amendment

Johnson argues that the complaint and the evidence in this case "fail to reveal any genuine issue of material fact that would show any liability pursuant to 42 U.S.C. § 1983 or state law." Dkt. No. 40 at 1. According to Johnson, he received information that a police officer witnessed plaintiff "attempting to enter the rear of the residence after scaling a fence that was part of a marked crime scene barricade," and in his experience "it was highly unusual for a person to attempt to enter a crime scene, particularly from the back door through a barricaded area." Id. at 10. Therefore, "probable cause existed to support the belief that Booker had committed or was committing a crime." Id. at 11. More specifically, Johnson's actions gave rise to probable cause that plaintiff had violated Va. Code § 18.2-414.2,[6] was attempting to obstruct justice by tampering with evidence, or was otherwise "involved in the murder." Id. at 12.

Plaintiff contends that Johnson "unlawfully seized" him "without any reasonable or articulate [sic] suspicion of him being involved in any criminal activity based on any verifiable facts at that time." Compl. ¶ 56. In addition, he contends that no officers had "probable cause to intentionally place their hands on plaintiff . . . and handcuff him." Id. ¶ 65. More specifically, plaintiff states that an officer's ability to arrest an individual is controlled by state law and the

---

[6] Virginia Code § 18.2-414.2 provides:

> It shall be unlawful for any person to cross or remain within police lines or barricades which have been established pursuant to § 15.2-1714 without proper authorization.
> Any person violating the provisions of this section shall be guilty of a Class 3 misdemeanor.

8

facts, when construed favorably to him, indicate that he "violated no state law." Dkt. No. 50 at 10. Even if he had violated Virginia Code § 18.2-414.2 by entering an active crime scene, as Johnson alleges, he contends that he would not have been subject to arrest for a violation of § 18.2-414.2 because Virginia Code § 19.2-74[7] does not authorize jail time for individuals who violate that statute and requires that offenders be released after the issuance of a summons; therefore, he should not have been held in custody. Dkt. No. 50 at 10. In addition, plaintiff contends that pursuant to Virginia Code § 19.2-81(B), which states that an officer "may arrest without a warrant any person who commits any crime in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony," Johnson was not authorized to arrest plaintiff without a warrant because he does not allege that he witnessed plaintiff commit a misdemeanor, only that he received a communication from someone that plaintiff had done so. Dkt. No. 50 at 10. Finally, plaintiff cites Flippo v. West Virginia, 528 U.S. 11 (1999) and Mincey v. Arizona, 437 U.S. 385 (1978) for the proposition that there is no murder scene exception to the warrant requirement. In plaintiff's view, his version of the facts is "squarely contradictory" to Johnson's proffered facts, and "there is ample evidence presented by [him] that precludes summary judgment." Dkt. No. 50 at 6, 9.

The Fourth Amendment serves as a bulwark against unreasonable searches and seizures by government agents. See U.S. Const. amend. IV. For that reason, interactions between police

---

[7] Virginia Code § 19.2-74 provides, in relevant part:

> Whenever any person is detained by or is in the custody of an arresting officer for a violation of any county, city, or town ordinance or of any provision of this Code, punishable as a Class 3 or Class 4 misdemeanor or any other misdemeanor for which he cannot receive a jail sentence, . . . the arresting officer shall take the name and address of such person and issue a summons or otherwise notify him in writing to appear at a time and place to be specified in such summons or notice. Upon the giving of such person of his written promise to appear at such time and place, the officer shall forthwith release him from custody.

9

officers and citizens are circumscribed by its strictures. For example, the Fourth Amendment requires that police officers have reasonable articulable suspicion that a person has committed or is about to commit a crime before detaining that individual for a brief investigative stop. See,e.g., Terry v. Ohio, 329 U.S. 1 (1968). In other words, an officer must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" Id. at 27. The information that an officer may rely on to establish reasonable suspicion must be based on the totality of the circumstances. Alabama v. White, 496 U.S. 325, 330 (1990). Moreover, the investigation must be limited to the purpose of the stop, United States v. Brignoni-Ponce, 422 U.S. 873, 881–882 (1975), and "last no longer than is necessary to effectuate the purpose of the stop," Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion). "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. In making such determinations, courts must be mindful of the balance between the public interest asserted by the government and the individual's right to personal security. Brignoni-Ponce, 422 U.S. at 878.

In addition, the Fourth Amendment dictates that "every arrest, and every seizure having the essential attributes of a formal arrest," be considered unreasonable unless it is supported by probable cause. Michigan v. Summers, 452 U.S. 692, 700 (1981). The information that an officer may rely upon to establish probable cause is "different in quantity or content" than that required to establish reasonable suspicion. White, 496 U.S. at 330. Although no bright line rule for determining probable cause exists, the means for determining probable cause are well settled. In Illinois v. Gates, 462 U.S. 213 (1983), the Supreme Court held that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts," and should be determined based on the "totality-of-the-circumstances." Significantly, an evaluation

of probable cause must be made in light of collective information known to the police at the time of an arrest. Maryland v. Garrison, 480 U.S. 79, 85 (1987); United States v. Diallo, 29 F.3d 23, 25–26 (1st Cir.1994). "The quantum of information which constitutes probable cause [is] evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed." Wong Sun v. United States, 371 U.S. 471, 479 (1963) (citations omitted). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt. And this means less than evidence which would justify condemnation or conviction." Brinegar v. United States, 338 U.S. 160, 175 (1949) (citations omitted). Importantly, the validity of an arrest "does not depend on whether the suspect actually committed a crime." DeFillippo, 443 U.S. at 37.

Under Virginia law, a police officer "may arrest, without a warrant, any person who commits any crime in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence." Va. Code § 19.2-81 (2008). A police officer may also arrest, without a warrant, an individual when he has personal knowledge "acquired by his personal senses" that a misdemeanor was committed in his presence. Durant v. City of Suffolk, 358 S.E.2d 732, 733 (Va. Ct. App. 1987). Such authority is consistent with the requirements of the Fourth Amendment. See Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (stating that an officer may "arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense.").

Here, this Court is first tasked with determining when during plaintiff's encounter the Fourth Amendment became relevant. Terry, 392 U.S. at 16. Construing the facts liberally in plaintiff's favor, his interaction with police began around 3:00 a.m. on June 14, 2008. At that

time, he encountered an unknown officer charged with securing the back door of a residence where a murder occurred, and he inquired about the condition of the individuals inside. Compl. ¶¶ 16-17. When the officer declined to answer plaintiff's questions concerning the individuals in the residence, plaintiff stated "he would be on his way." Id. ¶ 19. At that point, the officer advised plaintiff to follow him, and brought plaintiff to his supervising officer, Sergeant Johnson, out on the street. Id. ¶ 21. Until then, the Fourth Amendment was not implicated.

The unknown officer's directive to plaintiff to follow him out onto the street was more akin to a brief investigatory stop than an arrest. Plaintiff was not handcuffed, he was not locked in a car, he was not peppered with accusations or questions, and he appears to have been taken to Johnson with the limited purpose of further investigating his presence at the back door of an active crime scene. See Royer, 460 U.S. at 496 (stating that a suspect's confinement in a "small enclosed area" while "being confronted by two police officers" presented an almost classic definition of imprisonment"). When the unknown officer instructed plaintiff to follow him, the information available to the officer provided more than an "inchoate and unparticularized suspicion or 'hunch'" that plaintiff may have been involved in the murder. Terry, 392 at 27. First, when plaintiff approached the residence and inquired into the condition of the individuals inside he did so from the rear. Compl. ¶¶ 16-17. He did not call the Portsmouth police department, flag down any one of a number of officers who were on the scene, or attempt to approach an officer at the front door. Second, when the officer inquired into plaintiff's identity, plaintiff responded cryptically that he was "an acquaintance of individuals who were attending the party and the owner." Id. ¶ 18. Third, when the officer failed to answer plaintiff's questions to plaintiff's satisfaction, and despite plaintiff's stated concern for those in the residence, plaintiff simply stated "he would be on his way." Id. ¶ 19. Finally, the incident occurred around

12

3:00 a.m., an odd time for an "acquaintance" to appear at a crime scene and attempt to inject himself into an active investigation. Although plaintiff's actions at the scene of the murder investigation, in isolation, may seem anodyne, when "taken together" they "warranted further investigation," especially in light of the government's interests in solving the murder and preventing further crime. See Terry, at 22. Therefore, it was not unreasonable for the unknown officer to direct plaintiff to Johnson for further investigation.

Plaintiff's encounter first began to resemble an arrest when Johnson instructed the unknown officer to "put [plaintiff] in a car." Compl. ¶ 22. At that time, Johnson had probable cause to believe plaintiff may have been involved in the murder, a felony, for several reasons. First, Johnson was aware of all of the information discussed above at the time he instructed the unknown officer to place plaintiff in a car. Second, Johnson received a communication "from a police officer located at the back of the residence that a person had come over the rear fence and hedge, and that person was attempting to enter the back door of the residence." Dkt. No. 40 ¶ 20. Third, Johnson had known the victim to be "involved in the sale of narcotics," and finally, Johnson had known plaintiff to be involved in "narcotics related activities." No. 40, Ex. 1 ¶¶ 10, 23. Therefore, Johnson had probable cause to believe that plaintiff was involved in the murder and to further detain him.[8] When the $5,000.00 in cash, papers belonging to plaintiff, caplets containing a substance believed to be heroin, a firearm, empty caplets, a single-edged razor, screen strainers, rubber gloves, and a coffee grinder were discovered in the residence a short time later, there were additional grounds for detaining plaintiff. Dkt. No. 40 ¶¶ 34, 39; Ex. 1 ¶ 19.

---

[8] In his Motion for Discovery, Dkt. No. 51, plaintiff contends without further support that "Contrary to Det. Luck's allegation he did not recognize me to be involved in narcotics crimes nor Sgt. Johnson." This contention, which is nothing more than a conclusory allegation is belied by the record, which shows that plaintiff had three narcotics related convictions at the time of the incident in question.

13

Accordingly, defendants are entitled to summary judgment on plaintiff's Fourth Amendment claim against Johnson.

### B. Qualified Immunity

Alternatively, Johnson contends that he is entitled to qualified immunity in this case because he did not violate plaintiff's clearly established constitutional rights. Dkt. No. 40 at 14. In Johnson's view, the right asserted by plaintiff is the right "to be free from detention when it is reported to a police supervisor in charge of the scene of a recent murder that [plaintiff] had entered the crime scene and was attempting to enter the rear of the residence." Id. at 15. Such a right, he contends, has not been clearly established under relevant law. Id. And, even if such a right were recognized, any reasonable officer in Johnson's position would have believed that detention of plaintiff was lawful. Plaintiff contends that the "fabricated claims by the defendants . . . does [sic] not support their claim of qualified immunity," and defendant has not cited any case "in which detaining plaintiff was lawful" under federal or state law. Dkt. No. 50 at 13–14. In plaintiff's view, Johnson is not entitled to qualified immunity because the law is "clearly established, sufficiently clear, and the material facts are disputed on what actually transpired." Id. at 14. Finally, plaintiff argues that based on the established law Johnson "had notice" and should have known that he was violating clearly established law. Id. at 12. In his rebuttal brief, Johnson contends that plaintiff has failed to "identify any authority that is sufficiently similar to the facts of this case to warrant the denial of qualified immunity." Dkt. No. 53 at 3.

The doctrine of qualified immunity protects government officials from liability in civil actions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In doing so, it balances two

important interests: the need to hold government officials accountable for irresponsible exercises of power, and the need to shield those same officials from "harassment, distraction, and liability," when they act responsibly. Id. Whether a government official may be held liable for an unlawful search or seizure in violation of the Fourth Amendment turns on the "objective legal reasonableness of the action" in light of contemporaneous, clearly established legal rules. Wilson v. Layne, 526 U.S. 603, 614 (1999). For a legal rule to be clearly established in this context "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent," id., and "beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). Significantly, the Supreme Court has repeatedly instructed federal courts "not to define clearly established law at a high level of generality." Id. at 743. Therefore, any right alleged to have been violated "must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Layne, 526 U.S. at 615. This is especially true in Fourth Amendment cases in which it may be "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Saucier v. Katz, 533 U.S., 194, 205 (2001).

Here, it cannot be said that Johnson's decision to search was unlawful "beyond debate" in light of existing law. At the time Johnson instructed the unknown officer to place plaintiff in a police car, which in legal effect amounted to an arrest, Johnson possessed a sufficient quantum of information, discussed above, to conclude that plaintiff may have been involved in the murder. Based on the circumstances of this case, Johnson is entitled to qualified immunity for placing plaintiff under arrest after the unknown officer escorted plaintiff from the back door to Johnson's position on the street.

## IV. Motions and State Law Claims

In addition to his constitutional claims, plaintiff has alleged the state law claims of assault and battery, false imprisonment, invasion of privacy, intentional infliction of emotional distress, and negligence. Compl. Where § 1983 claims over which a district court otherwise would have original jurisdiction are subject to dismissal, there remains no basis to exercise supplemental or pendant jurisdiction over state tort claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); White v. Ammar's, Inc., 1988 WL 1077 at *1 (4th Cir. 1988) ("Because there is no subject matter jurisdiction, White's additional claims regarding pendant jurisdiction were properly dismissed."). Because defendant's motion for summary judgment will be granted and plaintiff's constitutional claims will be dismissed with prejudice, subject matter jurisdiction over plaintiff's state claims does not exist, and they will be dismissed pursuant to Fed. R. Civ. P. 12(h)(3). In addition, plaintiff's motion for discovery will be denied as moot because defendant is entitled to summary judgment as a matter of law.

## V. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment will be granted, and summary judgment will be entered in his favor. Plaintiff's Motion for Discovery will be denied as moot. An appropriate Order and Judgment shall issue.

Entered this 8th day of September 2017.

Alexandria, Virginia

/s/
James C. Cacheris
United States District Judge